Good afternoon, Your Honors. May it please the Court, my name is Carl Hittinger. I'm with the L.A. Piper Law Firm, and we represent Appellants in Appeal No. 11-4200. I'd like to reserve five minutes for rebuttal. Jennifer Clarke of Pilkop will be arguing Appeal No. 11-4201, the appellants in that matter. Your Honors, this is a racial discrimination case brought by seven student African-American appellants and their parents. We're familiar with the case. Help me get a handle on the distinction between the IEP-driven claims and the Title VI and 8083-viewing claims. They overlap, and to some extent I think they may have gotten conflated, but maybe you can state your position as to how they interplay. Your Honor, I'm at a bit of a disadvantage on that. Pilkop has been handling those cases. You're over to IEP? Perhaps, yes. Ms. Clarke could address those issues, but that's up to the Court. Okay. Well, let me ask you one where you can't answer, I think. The District Court was not that impressed with the statistical evidence that was put forward. There are a line of cases that suggest that all those statistical evidence may not in and of itself be enough because disparate impact will not allow you to prevail. It may be relevant to an underlying intent, and I wasn't sure reading the District Court's opinion of it. It was a 2009 opinion, and to an extent the 2011 opinion, that the statistical evidence was given the kind of weight that perhaps it could have been. Not saying it should have been given that kind of weight, but the kind of weight it could have been given. Yes, Your Honor. I think Barleton Heights made it very clear that statistical evidence is a consideration. It's not the sole consideration, and I think the importance of the statistical evidence here is it puts a context, it puts a racial umbrella, so to say, over the district that better explains how individual conduct happened to these appellants and what that means. So if you're talking, for example, about the history of this district, it's a district where there's been systematic over-representation of African Americans in special education classes. It was so bad that the Commonwealth in 2005 and 2006 came in and told the school district, you need to correct that disproportionality. I didn't understand it. People are not fungible. You have to look at each individual person and say, is this person being treated rightly? And I wonder how you could have a class action. I mean, I just couldn't, and I know the court didn't go for it, but I mean, you just have to look at the individuals involved. They could all appeal. They didn't like their assignment. Well, that's why the case is now individual. No, but I mean, they could individually, they were perceived. I've been in a lot of these cases where there are individual appeals. I don't like this assignment. I shouldn't be treated this way. Oh, that happened here, Your Honor. Yeah, but how can this be a class action? How can you say all people of this minority group were treated wrong or not, maybe some were not treated right? I don't know. Well, the case started as a class action. I know that. But I mean, the point is each person considered on their own merits. I mean, just take, for example, Ricky Coleman. His mother complained and the school seemed to respond. So I don't know how you get the inference of intentional discrimination. I mean, she stood up and it seems like they responded. They didn't respond. They didn't? No. What happened there is she observed the class, thought that her son was being talked to by the teacher in a condescending way, went to the principal, complained. But then the principal took action. Took action in the summer after the student graduated from that class. That's not action. Action should have been removing the teacher either during the year, having corrective action taken. Yeah, but then you get into a problem with the court overseeing the disciplinary matters and administrative actions of a principal, which you may be able to do in some context. And you've got a lot of other evidence here. It seems to me Coleman is probably not your best shot. But the fact that the principal would seem to respond, the parent may not have liked the response, but there appeared to be a response on the part of the principal. Maybe too late from your perspective, but the principal did respond to the complaint. But is that an issue for the court or for the jury is the question? This is a summary judgment issue here, your honor. And so did he respond quickly enough? Did the teacher get the right training? Did the student take it from the class? These are all issues for a jury to determine. They can't be determined by the court. We don't know what happened. What judgment are you seeking? Are you seeking damages for individuals? You'd have to look at each child. Maybe that child was treated right. I mean, these decisions are not... In other words, if somebody said, look, we're going to take all the black students and put them in a separate class, now you have something that's very definite. That's what you're alleging. Yes. But that wasn't so because it may have been there were different percentages, but maybe that was fully justified. But who's to determine that, a court in summary judgment or jury at trial? Well, no, it would be determined by procedures that are established. If you don't like it as an individual, but for a court to step in, this is really a slippery slope. Well, I think this court stepped into discrimination cases many times in its history. Yeah, but on a situation like this, where there is allocation of students based on what the perception of the school was as to the needs of the student. I mean, I just looked like it was an overwhelming problem. Well, it was an overwhelming problem that the school district did nothing about. And when the district does nothing about it and it persists and the percentages stay the same and continue to this day, then yes, the court has to step in according to Congress. But are you trying to rely... You started off by telling us about statistics and that actually the numbers have grown to disparity in terms of the percentage of African-American kids in school and those in the disability classes. Yes, they have. And yet at the same time, you're saying each child needs to be dealt with on his or her own basis. If that child needs help, that child should get help. How do you balance that? I mean, that really seems to be the principle that should take place. You don't want a situation by saying, wait a minute, you're 8.6% of the school and now we're at 9%. Sorry, you can't go into this special program. Of course, that wouldn't be fair to the is if the only evidence we had was the individual testimony that I tried to remove my child from special education, means African-American, and they refused to do that. That would be a different case. But if you layer on top of that the statistical evidence and the history of this over-identification, then it raises a racial issue, whether that was a racial intent or not a racial intent. And that becomes an issue for the jury. This isn't just a case about people coming in and saying they were discriminated. But each child has a program that's an individualized program dealing with that particular child, isn't that correct? That's correct. And in many cases that... Maybe I'm missing something, but it would seem that's what you do want for a child. If a child has an issue, a problem, and the school system is there to try to help, and you have a actually, in this case, laws in place to try to implement that, why not just follow through with that procedure? Well, what if the children are disidentified? The six of the seven were here. They were placed in special education classes and shouldn't have been there, and they were there for years, years. And then why were they there? Because they couldn't remove them. And each of those six go through the process of saying, wait a minute, I don't belong here. Or the parents, you know, yes, my child does not belong here. We have evidence that parents specifically went to the administrators, asked to remove their children, refused to let that happen. Wasn't there a procedure then to appeal to the state courts from the decision? I'm not familiar with that, your honor. There's certainly a right to bring a discrimination claim, which we brought if it was discriminatory. Do you think that there should be a damage claim on the basis of how who fixes damages? Who decides this child gets X dollars, this child gets Y dollars? I mean, I don't quite understand how it's all done. Well, just take an example of a student who was in special education, didn't get the college curriculum they need. Now they're in college. Now they can't succeed in college because they didn't have basic course they needed in high school to succeed in college. So you pay for tutoring. There's damages. Pay for tutoring. Take care of that child. But that has to be done on an individual basis. Yes, that's why this is not a class action anymore. It's an individual case. In part, I thought, in terms of the parents removing it, I was realizing that in part the parents did not know that they had the right to challenge and to remove. But even if they did know that, if the initial placement decision is driven by race, the fact that there may be a remedial remedy under the IEP process doesn't get around the Title VI issue that you're raising, does it? No, it doesn't, because it was happening on a systematic basis throughout the school district. How do you remedy that? You can't remedy it as a class action, as Judge Greenberg points out, because the individual issues. So Congress gave us Title VI, gave us 1983, to take on these cases, to correct things for the whole school, not just for six kids. What would be the relief that you would, if you were writing the opinion, you get to the last part, say the district court, you're the district court writing the opinion, you get to the last part and you're trying to fashion appropriate relief, what would be the relief that you would fashion to get to the problem that you're alleging? The relief would be what this court and district courts have been doing in this district for at least 30 years, which is you impose a consent decree, you have somebody assigned... We'll be on consent decree now, is this, because it's not going to... You're asking what this court should do? What, if you were writing the opinion, not a consent decree, that would be easy. Yes. Yeah, we'd love it. I don't think that's going to happen. Make it right now. Right, right up. I'm sorry, Your Honor. So the question is, what would... What would be the relief that would be appropriate given the problems that you're alleging? All right, I think what the relief should be is the district should do what it should have done when the commonwealth told it in 2005 with disproportionality. Go back and look and see whether there has been over-identification of African-Americans, the special ed, that shouldn't have taken place. Try to find out why there's disproportionality and try to correct it. Right, that should be the relief. That's just basic discriminatory relief. We don't give relief. And have somebody oversee... Or by having the... And there's a separate issue, obviously, under the consent decree with Gaskins or the commonwealth, but would that be a master that would do that? How would you... Yes, it would be a master, as this court's done with unions across the city, mass reporting to the judge. It's consent decrees to kind of deal with those issues on a day-to-day basis. And that could go on for years, but that's the only way you can correct it. And that's not unusual for this court to do that. That would be the relief you'd be requesting. Okay, I think you deserve some time in this broadcast. Thank you. Good afternoon, Your Honor. I'd like to reserve one minute. My name is Jennifer Clark. I'm here from the Public Interest Law Center. I represent the appellants in 4201. I'm prepared to discuss the issues in that appeal, but I would be, if you would prefer, I'd be happy to answer the question that Judge McKee posed at the beginning of Mr. Hittinger's argument, that is the relationship between the IEP and the race discrimination. It might clear up some of what I sense is some general confusion about the case. The general confusion in the case is that initially there were special education claims in the case. Those claims were dismissed because of failure to exhaust. There were also Title VI claims. What happened was through the course of discovery and through the process of the evaluations, the children discovered that they had never had, most of them, had never had the disabilities that the district said that they had. So the core here in the sort of central program that we're addressing in the other case is the process of identification. It's very subjective. A teacher refers a kid and then we found through our expert found that what was happening to kids is that the psychologists who are doing the evaluations were using subjective standards and they weren't using generally accepted national standards. So in the case that Mr. Hittinger was discussing, that's the core of the claim here and that's the common practice. That's why it was initially pleaded as a class action. Not only were these things happening, but the district was on notice that it had a disproportional number of African-American kids in special ed, which put them on notice that they needed, under the IDEA, the special education law, they needed to look into it and figure out what was going wrong and they never did that. So you say disproportionate. I know there are at least two students, maybe more, and what the district seemed to do is take the percentage of white kids in the district, percentage of black kids in the school district, and then analogize that to the percentage of white kids in special education and the percentage of black kids in special education. But the court never seemed to look at the fact that you've got some special ed classes that are 100% black according to two of the kids. Right. So that in and of itself is not intentional. We all agree with that. But what it does is it puts the district on notice that they're, and again, the special education law says this, and the Pennsylvania Department of Education told them, you have to figure out why this is happening. And the evidence that we would have put on at trial is, why is it happening? Again, subjective referral by the teacher, subjective evaluation by the psychologist, and I'm now taking a very long report by our expert and summarizing it and generalizing, but subjective evaluations. And then when our expert looked at these kids, they said most of them, five of the seven, never should have been in special education. They didn't have these, they did not have these disabilities. And this is a problem, the school district knew about it, and it let it persist. So that's the other appeal. I would to the next one if I've answered those questions. In the 4201, the Gaskin settlement in 2005, weren't most of these persons that are the plaintiffs here, weren't they evaluated prior to the 2005 settlement? I want to make sure I understand your question, but the Gaskin case was about a very different problem. That was about kids that are acknowledged to be kids with disabilities, kids with intellectual disabilities. I'm saying these individuals, were they not evaluated prior to the time of the Gaskin settlement? Most of the children in this case were evaluated, but the point here is that the Gaskin case was about something very different. Special education law covers a broad, broad range of issues, including what we have in this case, but the Gaskin case was about... I guess my point is, if there was a violation within five years after 2005, wouldn't that have been arguably a violation of the settlement agreement entered into, as opposed to a separate claim at this point? No. The settlement agreement in Gaskin dealt with a very specific issue of taking kids who have disabilities and sticking them in the special ed room. What the Gaskin case said was, the state failed in its duty to train regular education teachers. It failed in its duty to make sure that special education kids were included in regular classrooms, and it failed in its obligation to have a continuum of options for kids with disabilities. It was a 100-page complaint. The remedies in that case and the prayers for relief had to do with a very different issue than what we're talking about here, and so the settlement in that case... Of course, the legal issue that the judge failed to... made a mistake on is the interpretation, not of the settlement agreement, but of the release. Which judge are you talking about now? This case or Gaskin's? In this case, the district court in this case took a procedural shortcut and didn't look at the Gaskin case. The Gaskin release released all claims relating to the Gaskin case, and the Gaskin case didn't have anything to do with the claims here. But in the Gaskin case, you're saying they were denied a FAPE, right? In the Gaskin case, we said denied FAPE is sort of the big issue, but the small issue and specific issue that case was about was taking kids who had disabilities, who acknowledged they had disabilities, and putting them in a separate classroom. This court's opinion, Oberti, is really the classic example of what that case was about. That is, when a kid has a disability, the school has an obligation to consider all options before putting the kids in a separate classroom. So the Gaskin case was about a very specific part of the special education law. What the district court did here was the district court said, well, that's about special education law. This is about special education law. Must be a release. But the special education law has hundreds of obligations on the state. I mean, it requires the state to set up a hearing system. It requires the state to monitor for English language, availability of English translations for kids. So to say, going back to the legal issue for the district court, did the release in the Gaskin case intend to release any claim about any kind of any special education to release the state? And the district court here took a shortcut. I see I'm out of time. I had two other issues. Well, as you may have noticed, we don't seem to be particularly concerned about the color of the photons coming out of that little gizmo you've got here. Okay. And we'll give your friends on the other side a lot of latitude. So just what, in 4201, there were three basic legal errors that the district court was led to make by the fact that the district court took a procedural shortcut. There were no motions. These were all things that were argued in response and reply in connection with this classification. So the first fundamental legal mistake that the judge made was how to determine the intent of the release of the Gaskin case. And Gaskin was simply the integration mandate of 504. That's basically what that case was about. So that was what that case was about. And the remedies that were sought there were training of teachers, the state making sure that there was training of teachers, regular education teachers, the state making sure that there was a continuum of services available for the kids, and the state just making sure that the inclusion mandate was followed. So again, the legal issue that Judge Bartle had to think about was what was the intent when they settled that case. And the idea that the intent would be to settle all claims of any kind relating to anything in the special education law is an error as a matter of law. Maybe you're going there now. You're standing. Yes, I was just going to say, you addressed that. Standing. Yes, standing. So again, the judge was led to take procedural shortcuts that led him to make fundamental legal errors in standing. First, the judge held that concerned black parents didn't have standing because it didn't allege injury. But concerned black parents did allege injury in paragraph 110. And what it said was, as a result of the misidentification and low expectations of kids that we were talking about in the other appeal, concerned black parents over the five previous years had been compelled to refocus its energies on addressing that issue. That is an allegation of injury, exactly like the Havens case. What do you want us to do now? On that particular issue... No, overall, what should we do with these appeals? So on the issue of the release, that's a matter of law. Judge Bartle erred. He didn't really consider the intent. I would like you to reverse that and reinstate the Department of Education. On the issues of standing, at the very least, this court should reverse the district court's dismissal. The district court seemed to think he was considering a motion to dismiss. He wasn't. But at the very least, I think this court should reverse the judge's dismissal and have him apply the correct law. There certainly were allegations of injury. On the other second piece of standing, concerned black parents did have members. Judge Bartle dismissed the case on behalf of concerned black parents, saying because it was incorporated as a non-profit, non-member corporation, it didn't have members. But this court in the Public Interest Research Group case, as well as the Supreme Court, has said that's not a basis for finding that there's no standing. So for the standing issue, what we'd like the court to do is reverse the decision to dismiss the organization, and if the court thinks it's necessary, direct the judge to have a full factual airing with actual motions for summary judgment and actual evidence. I think there's enough evidence in the record already to establish that concerned black parents had standing, both on behalf of its members and on behalf of the organization itself. So I think that this court could actually reverse and hold the concerned black parents has standing, but alternatively, at the very least, the district court's decision on the basis of the pleadings should be reversed. May it please the court. My name is Howard Hopkirk. I'm a senior deputy attorney general, and I represent the Pennsylvania Department of Education in this case. I am sharing my time with Michael Christofko, who represents the Lower Merion School District Defendants. I will be using four minutes or so of our allotted time to argue the question of whether the claims against PDE are barred by the prior class action settlement agreement in the Gaskin case. I have two questions. Did the Gaskin case settlement really extend to claims of intentional racial discrimination? I would say not all claims of racial discrimination, but it does extend to the claims in this case. The claims against the department have to do with their failure to monitor special education by school districts. In Gaskin, it was in all school districts, all children needing special ed services were not being properly supported in regular classrooms given the free and appropriate education, and that type of monitoring applies to the plaintiffs in this case. To now say that, well, Gaskin was really this very narrow thing, and the things which were agreed to in Gaskin, which if you look at the settlement agreement, provided a lot of procedures to try to alleviate concerns, problems in providing special education services, and those procedures would have applied to the plaintiffs in this case. But wasn't it really focused on the integration mandate of 504 and things basically around that universe? I'm looking at the opinion in Gaskin's now, and the court specifically talks about the IDEA, the ADA. I don't see the Rehabilitation Act mentioned here, but I'm sure it's in there, which is very different than a 1983 Title VI claim where the allegation is at least to some of the kids, and that may be a problem. Off the bat, I'd let Your Honor know, there was no Section 1983 claim against the Department, so you're really just talking about the Title VI claim. But again, what I would say is what the Department was doing, they're monitoring the activities of Lower Marion, and whether Lower Marion acted correctly, whether they acted out of a racial motive or what their of the Department of Education as far as monitoring special ed services, and so the umbrella of... The way the release is worded, and it's an incredibly broad release, and there's an argument that it doesn't go to future claims. It seems to me it clearly does go to future claims. It says hereafter, and it goes back, as they all do, to the beginning of time, which is kind of, I guess lawyers still don't feel that they've covered themselves. But it's a very, very broad release. But I guess there is an issue about whether or not, if you're out in the field hunting rabbit, and a pheasant flies up, it's a... I won't get into why I said that, but it's a joke about it. If you're going down a road that is governed by the FRAP requirement, the IDEA, and that regime of remedial approaches to education in kids, and a settlement comes out of that, there is an issue about whether or not if another suit is brought, which is tangential in a sense, but unrelated because the evil being alleged is very, very different than whether or not kids are getting a free, appropriate public education. The difference is whether or not kids are being labeled as special ed merely because of their race, or, because I'm not sure that's what's being alleged particularly, but what really is alleged, and what the evidence suggests maybe should get a hearing, is whether a black kid in a similar situation, whether a black kid in the situation is more likely to be put into special education classes just because he or she is black, all of the factors being the same. That is at the heart of what they're alleging. Now I guess you could argue that that is something arising out of the IDEA structure, but it's very quantitatively different. It walks different, it quacks different, it I think these claims, the plaintiffs are in the class in Gaskin, and if you look at rules of race judicata, if you look at the prudential insurance case, it's not just claims that were actually brought, it's claims that could have been brought. I think that even though there were no racially based claims in Gaskin, it's still under the umbrella of the type of claims that could have been brought. I would say if you look at the prudential case, the court didn't say, your honor didn't say these particular claims could not be brought at all. What it said was you cannot bring these claims because you are basing these claims on matters which fell within the settlement, prior settlement agreement, and in this case even if a plaintiff has a claim in 2007, 2008, when the procedures that the department agreed to had been put into place, you can't say that they were born in a vacuum and their status, their evaluations, and everything about their educational history just started then. You have to go back into the pre-Gaskin period to find their whole history, and I think it's very unfair to say, oh no, we're going to consider these as new claims and they're not monitoring claims somehow. We're going to attribute the racial discrimination claims against the school district to the department because how's the department supposed to differentiate between all these claims? They can only have procedures in place for over 500 school districts to handle these claims. Is it still in effect, the consent decree? The consent decree expired in 2010, but I can tell you that that was a starting point and many of the procedures in place under Gaskin have been continued even though the settlement agreement has expired. Thank you very much. Thank you, Your Honor. May it please the Court? You have to pull that up a little bit. Certainly. You're a little bit taller than everybody else. My name is Michael Christofko. I'm here representing the Lower Marion School District along with Counselor Jenna Berman. First, let me address the status of the case as it was presented to the lower court at this stage of summary judgment. At that point in time, there were only two claims left in the case. There was a Title VI claim for intentional racial discrimination and a 1983 claim for violation of equal protection, which was also based upon racial discrimination. They were the only two claims left in the case. At the time that the district filed its motion for summary judgment, the third amended complaint, which was the last pleading filed by the plaintiffs, said clearly that all of the plaintiffs were students who were disabled and that they were treated differently than similarly situated Caucasian students with respect to their education. That is a theme that was pervasive throughout all of the pleadings and throughout all of the discovery. In response to summary judgment for the first time, the plaintiffs came forward with a new claim that they were disidentified and that's really our claim here. By the way, we don't think we should have to put forth evidence of the fact that we were treated differently than similarly situated students because that's not our claim either. In essence, what they did was completely change the claim around after the district had filed its motion for summary judgment. Judge Bartle, listening to all of this evidence, gave the plaintiffs every benefit of the new allegation that all of a sudden they're not disabled students and nevertheless said for purposes of summary judgment, he will consider the fact that they were inappropriately identified. No, he considered the claim they were inappropriate. That's right. You said fact. Well, he treated it as a fact in their favor for summary judgment. Secondly, he also lowered the standard under the McDonnell-Douglas test, lowered the fourth that children were treated differently than similarly situated Caucasian students to a prong that was a much lower requirement that was advocated by the plaintiffs that was set forth by this court in the Anderson versus Wachovia bank case, which was just that there was some indicia of discrimination that occurred. Even doing all of that, in analyzing all of the evidence that was marshaled over this entire four-year protracted litigation, Judge Bartle concluded that there was no evidence of racial discrimination. The reason why he was able to do that is because primarily the evidence put forth by the plaintiffs below consisted of statistical evidence that merely went to show that there was a disproportionate number of African American students who had been identified for special education versus what their overall population was in the student body. There was absolutely no evidence presented as to why that was the case. There was no evidence presented that African American students were subjected to different procedures for special education identification. There was no evidence presented that African American students were given different testing instruments or observed in different manners than Caucasian students. There was no evidence presented at all that the special education procedures utilized for the plaintiffs differed in any way from the special education procedures utilized by the district for the remainder of the students. Additionally, the other arguments that were advanced below also go to the same idea of just disproportionality. The one argument in particular that's been advanced is the suggestion that the one consultant retained by the district had overheard some of the teachers saying that they felt that there was disproportionate discipline of African American male students. She noted that that was a national trend and that people in the district said that they felt that that occurred there as well. Again, simply that the number of African American male students who were receiving suspensions was greater than the number in the overall population would suggest. There was no evidence presented in any of the record as to why that was occurring. Is there ever a situation, I'm thinking about the International Brotherhood of Teamsters versus the U.S., where the court said that statistical evidence that gives rise to, that shows an imbalance, a statistical imbalance, can be indicative of an underlying intent? There's clearly a difference in causation and correlation. Do we ever get to a point, and I don't know where that point is, I'm not sure it was reached here, but is there a point where statistical evidence alone can show such a close correlation, a correlation, if not of one, of .99, that that correlation can only be explained if one assumes an underlying intent because of conduct that would lead to that correlation, and therefore correlation and causation in some cases start to equate with one another? It's a convoluted question, but do you understand what I'm asking? I do understand, Your Honor, and I believe that it is possible to get to that level, but what you would need is much more detailed information as to who the individuals are within the group before you could make that type of correlation. Here, the only evidence that was presented by the plaintiff's expert was the number of African American students who are enrolled in certain classes or in special education versus the number of Caucasian students. There was no further digging down into the data to see any of the similarities between the individuals. Well, that's part of, maybe you had a concern because the court didn't do that either and could have. The fact that you have some special education classes that are 100% black, if that's true, that's the allegation and that's some of the testimony, there may be a reason for that which is totally legitimate, but it would certainly be the kind of thing one would assume would survive a summary judgment motion based upon whether or not that's enough evidence to get to a jury on discriminatory intent. Well, in this case, in the posture that the case was presented to the court, the plaintiff had the burden to come forward with evidence to meet the elements that they would have to prove in trial. And what the plaintiff came forward with is just this bare statistical correlation without any further information to dig down deeper. The trial court could not determine whether there was anything more there because the plaintiff failed to come forward with any of that evidence. What about the information that at least five, if not six of the seven students here were misidentified? It is true that in response to summary judgment, the plaintiff produced a rebuttal expert report to the district's report that indicated by psychologists who felt that she believed that these students were misidentified. She, however, did not attribute that misidentification to a racial motive on the part of the district. She did not indicate to the district... She wouldn't be able to. There's no way she could. Well, exactly. And in fact, there was no evidence to suggest that the district identified these students on the basis of their race. Again, the psychologist did not come forward with any evidence to suggest that the district evaluated these students any differently than the district evaluated other students. In fact, her main criticism of the district was that the district failed to take into account cultural differences with these students. Meaning the district failed to take their race into account when identifying them. Not that the district treated them the same as other students. That was her primary criticism of what the district did. And of course, she had criticisms with the percentage that the district looked at in determining whether a specific learning disability exists. But that's the percentage that the district uses across the board. It's not just the percentage for African American students. The district has procedures in place that are followed for all students. And the fact that a psychologist could disagree with the district psychologist and say, no, I don't think this person met those criteria, doesn't prove or produce any evidence to suggest that that was a result of these students' races. The psychologist did not dig down into any further information or request any additional information in order to ascertain what that identification process looked like for the plaintiffs versus other students to see if there was perhaps some other indicia that could be pointed to as to why that occurred. Instead, it was simply, I don't believe these students were improperly identified. From that, the plaintiffs have made the leap that therefore it must be because of their race. That is essentially the argument that's here. We believe that they got an improper identification through the special education process. It must be because of their race. That's the argument that's being presented. And that's the sum total of the evidence. In fact, the suggestion that some of the plaintiffs are not disabled actually flies in the face of the fact that the plaintiffs actually pursued special education due process complaints against the district, advocating not only that they were disabled, but the district wasn't giving them enough special education services. As a result, the district entered into settlement releases, which were the subject of the district's cross-appeal. That confused me too. There is definitely a tension between what was alleged in the third amended complaint, what was argued in the case all the way up until the response to summary judgment,  and then all of a sudden the new theories, supported by the rebuttal expert report of Tawana Jones, that all of a sudden there's this misidentification. I think the important point though here for the court is that Judge Bartle gave the plaintiffs the benefit of the doubt. Judge Bartle said, okay, I'll assume that you were misidentified. Let's see if there's any evidence here to indicate that that was as a result of race. And there was none. There was no evidence that was brought forward to suggest that either the statistics or the procedural violations that the plaintiffs allege in the IDEA, or the classes that the plaintiffs ended up taking, had anything to do with their race. And one of the things that I think is telling is that one of the rebuttal experts that the plaintiffs brought forward indicated that disproportionality in and of itself is not a bad thing. If more students who are minority need special education services, they should get them. The question isn't, what are the numbers? The question is, why are they assigned to special education? And that is the piece that the plaintiffs never bothered to look into. They never got any evidence of it. They never presented any evidence to the court as to the why. And that is why that summary judgment was appropriate. Well, how would they do that? If there's evidence that they were misidentified, how would they present evidence as to what the rationale, other than by evidence of a statistical imbalance that, according from International Brotherhood of Teamsters in Supreme Court, is, quote, often a telltale sign of purposeful discrimination, absent explanation? Well, as this court has indicated in both prior versus the NCAA, as well as in other cases, that statistics by themselves are not sufficient. You need that extra indicia. And in our brief, we had cited some cases where this court has specifically pointed out that when you're looking at proving an individual claim of racial discrimination, that a plaintiff that offers evidence concerning the racial composition of programs or classes must account for characteristics of individual students when attempting to prove individual disparate treatment. Well, they've done that by showing that the individual characteristics of the student wouldn't justify putting them in the class. The problem is we're trying, in a sense, to nail jelly to the wall. It's not the easiest thing in the world to do. So if we don't allow inferences to arise from evidence of very strong correlation, to allow a fact-finder to determine whether or not that correlation plus other evidence by itself is not enough, to determine whether or not that suggests causation, how in the world would you prove such a claim? Well, one of the ways that it could be proven is to actually take a look at how similarly situated Caucasian students were treated. Taking a look at similarly situated Caucasian students who had the same test scores, the same IQ scores, the same classes, the same type of grades, and see were they identified as needing special education or were they not identified? Did they go through the same process that the plaintiff went through or didn't they go through the same process? That is the type of analysis that would be useful in making a determination as to whether these statistics actually mean anything in the context of this race discrimination claim or whether it simply means that for whatever reason there were a larger number of African American students who tested as eligible for special education services. I think one of the comments earlier is apt. The district is bound by law to treat every student who is tested for special education services as an individual. That's the individual education plan that they get. They have to be individually evaluated, they have to be individually programmed for, and they have to be individually monitored as far as their progress is concerned. Any suggestion that the district should in some way try to dissuade African American students from entering into special education or provide a more rigorous testing for African American students to make sure that the numbers are more in line would run afoul of the IDEA. The district simply cannot do that. The district has to test the students it's presented with and if the results indicate that the student's eligible, make that recommendation to the parent and the parent has the right to choose special education or not. And in this particular instance, the plaintiffs had every opportunity in the world to dig into this sort of comparative evidence, and in fact they chose not to do that. With education laws, I don't know, would it allow a random, just taking what you just said, which strikes me as a very good point, does education law allow a process whereby a group of plaintiffs, this group or another group, could take a random sample of white students in special ed classes, look into their records and have a psychologist or an expert determine whether or not that kid's placement in that class was appropriate or are there privacy issues that would prohibit that? Well, there would have to be a protective order that would be put in place removing all personally identifiable information from the other student's files, anybody that wasn't a plaintiff in the case, their name, social security number, anything that would allow somebody to identify who that child is, but the salient data, as far as their testing data, their grades, that sort of information could be released under appropriate confidentiality order monitored by the court that would allow an expert to undertake that sort of analysis. And it wasn't even attempted here. But how big is the universe? And I think it's in his last opinion. What's the universe, the number of students who are in special ed classes in the Lower Merion, the N of the equation? I don't know what the total number is. It's hundreds. I believe it's less than 1,000. Okay. So that might suggest a relatively small sample. If N is that big, you may not need that largest sample to get to a statistically appropriate indication of whether or not there's a disparate placement of blacks as opposed to whites in special education classes. Well, one of the other issues is that when the class action was denied, when the petition to certify the case as a class action was denied by the lower court, one of the things that the plaintiffs argued at that time is that should the case go forward, they would have to retain educational experts to do this very sort of analysis, to conduct this sort of analysis and move the case forward. And yet, for some reason, after the class action was denied, that analysis was not done. Instead, just the very superficial statistics of, you know, just give me the numbers and put forth in front of the court, which really doesn't even require an expert to do. It's, you know, these are the numbers, and anybody could do the statistics on those. That's what the evidence was. Not everybody. Not everybody understands statistics. The other issue... I see that my time's up. I wanted to just briefly address the issues about standing that the court had brought up earlier. The... On the motion for class certification, the district at that time moved to dismiss concerned black parents as a part of the case for lack of standing. At the time that that occurred, there was no objection made to the procedure that was utilized. The district court treated it as a motion for summary judgment and looked at deposition testimony, looked at exhibits, and took the briefs of both parties into consideration and entered a decision. And the decision was that not only had concerned black parents failed to establish that they had an individual right that they were trying to pursue on their own behalf, but additionally that the evidence of who their members were failed to meet the minimum standards to show that they had people who acted with sufficient indicia of membership that they could bring a claim on their behalf. The testimony was clear that there are no members of concerned black parents, that they consider the community as a whole to be their members and their people. Isn't that a similar situation? Where there were no formal members but the governing entity, the board wherever it is, is elected by a group of people who voluntarily associate with the organization? It's a different situation in this context, Your Honor, because in this context, the people who consider themselves to be members of concerned black parents, when they act, they don't even act on behalf of the organization. They act as individuals. There was no testimony that any of these people did any acts on their own or did any acts as representatives or on behalf of the organization. Moreover, the individuals who are considered to be the members, so to speak, of concerned black parents are all adults. The claims that exist in the case are a Title VI claim and a 1983 claim for discrimination in the context of delivering educational services to students in the Lower Marion School District. None of the people who are in concerned black parents could have claims brought on their own behalf because the members wouldn't have standing to bring their own claims. Therefore, the organization doesn't have standing to bring claims on behalf of those individuals. That's probably further than you need to go. You're suggesting a parent doesn't have standing to bring claims on behalf of his or her kid? Well, in this case, there wasn't any evidence that any of the members had children in the Lower Marion School District. The evidence that was presented was that it was just basically the community as a whole that felt that they either were a member or were not a member. There were no formal lists kept as to who those people were. There was no idea as to how to identify them. It was just sort of a feeling that people in the community had as to whether they in fact had standing or not. What about their own standing? Mr. Clark mentioned Paragraph 109, but I've seen the 110, 111, with the specific allegations of injury to the organization, forgetting about associational standing. Judge Bartle, in his opinion, cited Sierra Club. He mentioned injury, possibility of injury to the organization, but his real focus was on associational standing. That's right, although in the complaint there were allegations that the program had to be redirected. However, in the deposition and the evidence that was produced through the discovery, there was no evidence of any such redirection. In fact, the only evidence that was produced was that the organization continued to fulfill its mission from 2005 when it was formed up through the present. Even though there was that allegation in the complaint, the discovery established that that allegation was not accurate. When the record was put forward to Judge Bartle, and he ruled on this and treated it as a summary judgment, he was looking at the actual factual evidence that was adduced through a deposition of a corporate representative of Concerned Black Parents, and that evidence showed that there was no such direct injury to the organization, that the organization was merely fulfilling the same mission that it set out to fulfill when it was initially formed. Any additional questions? Okay, thank you. I think both of your opponents reserved some time. Thank you. Foremost, with all due respect to my opponent, this Court in 2010 in the Anderson case made it quite clear that we have repeatedly stated that comparative or competitive evidence is not a necessary component of a discrimination plaintiff's prima facie case and should be applied in a relaxed way. So you've already addressed the issue whether you need comparative evidence. You don't need comparative evidence for a Title VI case, but in this case there was comparative evidence. The comparative evidence came from the district. Their expert, Dr. Rescheli, did this comparison. He basically took the files of the black students, the white students, threw them down the stairs, and concluded at the end of that that he couldn't make a comparison because it was an apples-to-oranges comparison. What do you mean you couldn't make a comparison? He said that if you looked at the appellant's files, for example, you could not find a comparable white child who had the same circumstances to make the comparison to see whether one had been misidentified and one had not. I mean, because they weren't in the specialized program? They were in the specialized program, but he couldn't put the variables together because the variables were so different. And I think it's maybe why this Court in Anderson said the comparative evidence is very difficult to get into. That doesn't leave us anywhere. It leaves us for purposes of summary judgment, I think, that this case should go in front of a jury. Well, it leaves you with statistical evidence. Okay. This case is a lot more than statistical evidence. And they keep saying that. There's no evidence, no evidence. Where's the evidence? We have their consultant. I was hired by the school district in 2005, Dr. Barbara Moore Williams, to look at these issues of discrimination. That was her job. And she found out, after she talked to the teachers and dealt with these issues, that she thought there was discrimination, that she thought the discrimination was causing this disproportionality, and that she thought that the district wasn't doing enough to correct the issue. That's their witness testifying in admission of their witness in this case. That's pretty hard evidence for purposes of summary judgment. The map presentation, you've all seen that. I don't need to go over what that said and the inferences that can be drawn from that. Was there an issue about the extent to which that could be held against the school district? Oh, yeah, the district court said that it wasn't an admission of the school district because there was no proof. Right. And I think this court's made it very clear in Judge Greenberg and Lightning Liu's case and Judge Ambrose and your Mara case that all you have to show for purposes of admissibility is that a document was produced, was produced by the party, it's a business record of the party, and for purposes of summary judgment that's enough to put in front of a jury. So again, Judge McKee, going back to your questions, I think where you're going with this is it's more than a case about statistics. There's plenty of other evidence that we've laid out in great detail in our brief. This is a summary judgment case. This isn't a trial. And this court has said it's a relaxed standard. The Supreme Court said it's not an onerous standard. This court's also said that intent is a factual issue necessarily that cannot be determined in summary judgment. So what's the walk away from this case if it's affirmed? The walk away, Judge Ambrose, I would submit is similar to what you said in the Mara case last week in your dissent. You said in that case... I had a very bad week last week. And you wrote a very good opinion. But in that case you made, I think, a very valid point that applies here. You said, I'm paraphrasing, that if there's a wrong that the school can correct, the school should try to correct the wrong. Otherwise, going forward, there's a disincentive for the school to try to do anything about it. And that's what we have here. We clearly have a wrong against African-Americans. Statistics bear that out. The testimony bears that out. And that has to be dealt with. It can't be dealt with under the IDEA. It can't be dealt with in a class action. It has to be dealt with in this individual system. But here, the question before Judge Bardo was, if there's a wrong, is it intentional? And he found that there was not enough evidence of intent. Because he rejected Barbara Moore Williams' testimony. He's not an admission of a party. He rejected the map presentation. I think what he said with regard to Ms. Moore Williams, that she had actually stated that there's racism in all school districts. And that the Lower Marion School District's problems are not different from any other school district. Close quote. And that they were, quote, not based on anything she observed firsthand, but rather on her own personal belief and hearsay statements of others. Well, she based it on meetings with teachers in the school and separate cadres where they told her about their experiences over a five and six year period. With better evidence in need of that. But also, this court in the NAACP case rejected that concept. Just because there's discrimination in the country doesn't mean you can have discrimination in your school. That's just a basic concept. And that's not a defense to discrimination. And that's what the judge said. And the judge was wrong in saying that. The final point I'd like to leave you with is, again, the walk away from this case. There's only one other case in this circuit that the district cited that we found. And Judge Greenberg comes from New Jersey. Judge Irenas decided this case. It was a case involving a fight on a school bus. And it was brought as a discrimination case. And he granted ceremony judgment saying it wasn't a prima facie case because he said, just because the black students got more of a penalty than the white students doesn't show discrimination. And you know what? He was right. He was right. That's the only case in this circuit where court service said, that's not enough evidence for a prima facie case. So if this court would affirm this, the takeaway from this case would be, in a case where there was statistics, there was testimony, there was documentation, in that case, it doesn't survive ceremony judgment under a relaxed standard under Title VI. And therefore, this wrong cannot be righted. I don't think that's what this court should be doing. Thank you. Thank you. Ms. Clark, is there a minute? Three points. First, on the release, the release is broad, Judge McKee, but it does have to, the claims have to relate to the Gaskin case. So that is a significant limitation. Arise out of, that's probably the same thing. Arise out of, relate to, the Gaskin case. And Mr. Hopkinson said that the case, that both cases have to do with monitoring, but they're very different statistical sets. The monitoring for Gaskin had to do with how many kids are included for 70% of the day, 80% of the day. The monitoring in this case has to do with how many African-American kids are in special ed. So monitoring is a very broad term. Second, on the question of standing, there was no motion to dismiss. Mr. Kraskovko was mistaken. There was an earlier one that had been granted, but the case had then been repleted. So there was no motion to dismiss. Judge Bartle thought there was, and he treated it as a motion to dismiss. But it was decided as a matter of law. And that's very significant because Mr. Kraskovko here in the Court of Appeals for the first time starts arguing about what the facts were. There were lots of members of Concerned Black Parents. Ms. Carter's testimony, her deposition testimony is full of evidence about the fact that people were members. This organization's been around since 1992. There were presidents, there were regular meetings, there were committees. Judge Bartle didn't go into any of that because he bought the argument that the school district made because it was a non-member corporation. It couldn't have members. So again, there was no factual airing of this. There was one deposition taken on the issue of class certification. But there was no motion, there was no factual airing. Finally, on this issue of intent, I just want to get back to the expert report, our expert report, Dr. Jones at 2306 through 2353. Dr. Jones didn't just complain about the lack of cultural sensitivity. Dr. Jones talked about how the procedures for evaluating kids were subjective, how they were not accordance to national standards. And that in and of itself isn't intent, but when you couple that with the known disproportionality, the fact that the school district had been on notice and in fact instructed to fix it by the Department of Education didn't look into it, didn't fix it, and these subjective non-nationally used standards procedures continued. That's the evidence of intent. The other things that we put out there are the cultural atmosphere into which these wrong misidentifications occurred. Thank you. Thank you. I think also very well done. We don't have a lot of days like this where we see consistent really excellent argument. So to those of you who don't come here that often, it's not always like this. This was a day with some really fine lawyers making very good arguments. We thank you for your effort. Could we get a transcript?